# United States Court of Appeals
## For the First Circuit

No. 25-1799

GREATER BOSTON LEGAL SERVICES; ARAUJO & FISHER, LLC; ANNELISE M. ARAUJO; STEFANIE FISHER,

Plaintiffs, Appellants,

DEMISSIE & CHURCH; SUSAN CHURCH; GRAVES & DOYLE, Attorneys at Law; KERRY DOYLE; WILLIAM E. GRAVES, JR.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as United States Secretary of Homeland Security; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in the official capacity as Director of United States Citizenship and Immigration Services; IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in the official capacity as Senior Official Performing the Duties of Director of Immigration and Customs Enforcement; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in the official capacity as Commissioner of United States Customs and Border Protection,

Defendants, Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), United States Secretary of Homeland Security Markwayne Mullin is automatically substituted for former United States Secretary of Homeland Security Kristi Noem. Likewise, Senior Official Performing the Duties of Director of Immigration and Customs Enforcement David J. Venturella is automatically substituted for former Senior Official Performing the Duties of Director of Immigration and Customs Enforcement Todd M. Lyons as appellees.

Before

Gelpí, Howard, and Dunlap,
Circuit Judges.

Sandra H. Masselink, with whom Adriana Lafaille, John T. Montgomery, American Civil Liberties Union Foundation of Massachusetts, Inc., and Ropes & Gray LLP, were on brief, for appellants.

Susan M. Finegan, Emily Kanstroom Musgrave, Gabrielle Brown, Alexa Greco, Cassandra Harris, Savannah Wormley, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., and Nicholas A. Butto on brief for American Immigration Lawyers Association, amicus curiae for appellants.

Simon G. Jerome, with whom Brett A. Shumate, Assistant Attorney General, Leah B. Foley, United States Attorney, and Charles W. Scarborough, Attorney, Appellate Staff, Civil Division, United States Department of Justice, were on brief, for appellees.

October 29, 2026

**GELPÍ**, **Circuit Judge**. A group of two immigration attorneys, a law firm, and a legal services organization (collectively, the "Appellants") filed suit to enjoin the Department of Homeland Security ("DHS") from routing discovery in immigration proceedings through Freedom of Information Act ("FOIA") requests. Appellants brought claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, et seq., challenging this alleged "Nondisclosure Policy" as violative of the Due Process Clause, the Immigration and Nationality Act, and DHS regulations. The district court dismissed all the claims at the motion to dismiss and summary judgment stages. Appellants appealed those decisions. After our own review, we conclude that Appellants lack Article III standing to challenge the Nondisclosure Policy. Accordingly, we **affirm** the district court's judgment for the government, albeit on different grounds.

## I. BACKGROUND

### A. Facts

Appellants Annelise M. Araujo, Stefanie Fisher, Araujo & Fisher, LLC, and Greater Boston Legal Services are immigration attorneys, a law firm, and a legal services organization that represent noncitizens in immigration matters and proceedings. Appellants' practice area implicates the regulatory framework set forth by DHS, which is responsible for administering and enforcing immigration laws in the United States. DHS carries out its

responsibilities through component agencies such as the United States Citizenship and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP") (collectively, and including DHS, the "Agencies"). USCIS is responsible for adjudicating immigration benefit requests, such as asylum; ICE enforces laws regarding removal proceedings; and CBP enforces laws regarding the entry and exit of people and goods at the United States border. The Agencies, together with various individuals serving in leadership positions within them, are the Defendant-Appellees in this appeal (collectively, the "government").[1]

The Agencies maintain records for every noncitizen with whom they interact. These records include prior application materials, visa application materials, records of prior removal proceedings, notes from asylum or credible fear interviews, criminal history records, identification documents, and other forms. Some, but not all, of these documents are stored in the noncitizen's "A-file," the primary record of the person's immigration history. These documents are used in immigration proceedings.

[1] Markwayne Mullin, Joseph B. Edlow, David J. Venturella, and Rodney S. Scott are the individual Defendant-Appellees, all sued in their official capacities.

As alleged, when Appellants have requested documents in the Agencies' possession, the Agencies have directed them to file FOIA requests to obtain the records. In the asylum context, for instance, applicants cannot conduct discovery of the records utilized by USCIS asylum officers and instead "may" seek those documents "through a [FOIA] request." 8 C.F.R. § 208.12. A similar practice exists in removal proceedings, where ICE often directs noncitizens to FOIA and has circulated form response letters for its attorneys to refer noncitizens to this process. Appellants lump these examples together to establish the purported Nondisclosure Policy -- or, put differently, the "systematic failure of [DHS] to produce to noncitizens and their counsel the records that are necessary to support their claims and defenses or eligibility for benefits in a range of civil immigration proceedings."

Appellants explain that the drawback of the Nondisclosure Policy lies in the content and timing of FOIA responses. Although the Agencies must respond to FOIA requests within twenty business days, allowing for an additional ten business days if "unusual circumstances" arise, 5 U.S.C. § 552(a)(6)(A)(i), they regularly fail to meet that deadline. And, even when FOIA responses arrive on time, the Agencies often omit documents and/or redact information.

Because Appellants cannot know for certain whether they will receive all of the requested documents or whether those documents will arrive in a timely fashion, Appellants frequently seek to obtain this information through alternative means. These efforts include anticipating what documents DHS might use in proceedings; conducting interviews with clients, family members, and prior attorneys; and collecting records from numerous courts. Further, Appellants must seek continuances in immigration court as they wait for documents to arrive; file, track, and appeal FOIA matters; and prepare alternative, and otherwise unnecessary, applications.

These additional tasks require attorneys and support staff to spend time and money submitting document requests and retrieving records. Because Appellants' representation is mostly paid via flat fees, they are often not fully financially rewarded for the time and resources they must spend in attempting to recreate and recover records. Further, the extensive efforts required to seek documents limit Appellants' capacity to represent more clients.

**B. Procedural History**

In January 2021, Appellants filed suit in the United States District Court for the District of Massachusetts, claiming that the Agencies followed a Nondisclosure Policy that violated the APA, 5 U.S.C. § 706. They alleged that the policy was

"arbitrary, capricious, an abuse of discretion, unconstitutional, and otherwise incompatible with law" because it violated the Agencies' disclosure obligations under two provisions of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1229a(a)(4)(B) and (c)(2)(B), a DHS regulation, 8 C.F.R. § 103.2(b)(16), as well as the Due Process Clause, U.S. Const. amend. V.

The government filed a motion to dismiss. In its order addressing the motion, the district court concluded that Appellants had adequately pled interests within the protection of the INA and its implementing regulations, but not the Constitution's Due Process Clause, which only noncitizens themselves could assert. It then held that while Appellants plausibly alleged they were denied access to records based upon an agencywide policy covering certain asylum proceedings, they failed to allege the existence of such a policy with respect to other proceedings described in the complaint, namely removal proceedings. Accordingly, the district court granted the motion to dismiss as to Appellants' due process claim and the APA claim predicated on removal proceedings and denied it insofar as the APA claim was predicated on asylum proceedings.

Appellants subsequently filed an amended complaint, adding allegations to support the removal-specific portion of the APA claim. They alleged that ICE updated its internal procedures in the wake of Dent v. Holder, 627 F.3d 365 (9th Cir. 2010), which

held that noncitizens who must show lawful presence in removal proceedings shall have access to their A-files. Id. at 374. According to Appellants, ICE decided to follow Dent only in the Ninth Circuit, and maintained FOIA as the designated mechanism to obtain documents in other jurisdictions. Even within the Ninth Circuit, the allegations stated, ICE narrowly interpreted the decision to apply to a limited set of documents and continued to direct noncitizens to the FOIA process. Further, Appellants alleged that ICE had developed form response letters to refer A-file requestors to the FOIA process.

The government again moved to dismiss. The district court granted that motion, permitting Appellants' case to proceed only with respect to affirmative asylum proceedings. The district court reasoned that, even assuming the existence of both a policy and discrete agency action, Appellants pointed to no authority that imposed a disclosure obligation on ICE in removal proceedings. Thus, Appellants failed to plead that any such policy was arbitrary and capricious.

After the resolution of the motions to dismiss, each side moved for summary judgment on the surviving claim: whether DHS' practice of routing document requests through FOIA in asylum proceedings violated the APA. The district court granted summary judgment for the government and denied Appellants' motion for summary judgment. The district court determined that, on the

summary judgment record, Appellants did not establish that a formal policy existed within DHS and, even if they did, such a policy did not violate the disclosure requirement in 8 C.F.R. § 103.2(b)(16) and was neither arbitrary nor capricious.

Appellants timely appealed the district court's decisions granting the government's motion to dismiss in part and the motion for summary judgment. During oral argument on May 7, 2026, this Court ordered the parties to file supplemental briefs addressing the question of Appellants' Article III standing under FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024).

## II. DISCUSSION

Appellants raise two issues on appeal. First, they argue that the district court erred in granting the government's partial motion to dismiss. Specifically, they claim that the court erred in (1) dismissing the portions of the APA claim that alleged statutory and regulatory violations, except as to the affirmative asylum context, and (2) dismissing the portions of the APA claim that alleged violations of due process rights. Second, Appellants maintain that the district court erred in granting the government's motion for summary judgment as to the affirmative asylum claim. The threshold question we face, however, is whether Appellants have established that they have Article III standing to present these claims. Our answer is in the negative.

As federal courts are courts of limited jurisdiction, we begin by ensuring that we have jurisdiction to answer the questions presented in this appeal. Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016). Although the district court did not analyze standing -- and the government, for its part, did not challenge it -- we are obliged to address it as a jurisdictional prerequisite. See Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño, 604 F.3d 7, 15-16 (1st Cir. 2010) ("Article III limits our jurisdiction to 'cases and controversies,' and our 'obligation to inquire sua sponte into our jurisdiction over the matter' exists in every case. That obligation extends to determining whether a party has constitutional standing to sue . . . ." (quoting Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005))). In doing so, "we 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.'" Kolackovsky v. Town of Rockport, 165 F.4th 114, 119 (1st Cir. 2026) (quoting Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020)).

Appellants, as the party invoking federal jurisdiction, bear the burden of establishing Article III standing. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). To do so, Appellants must demonstrate "(i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused

or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." All. for Hippocratic Med., 602 U.S. at 380. "The asserted injury must be 'concrete, particularized, and actual or imminent.'" California v. Trump, 183 F.4th 52, 64 (1st Cir. 2026) (quoting TransUnion LLC v. Ramírez, 594 U.S. 413, 423 (2021)). To satisfy the causation element, Appellants must demonstrate "a causal connection between the injury and the conduct complained of, where the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.'" Lyman, 954 F.3d at 361 (citation modified). Lastly, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (citation modified).

First and foremost, in response to our request for supplemental briefing, the government argues that Appellants have failed to adequately allege standing because they cannot show that the unlawful government action -- namely, the purported Nondisclosure Policy -- actually exists. Given that "critical deficiency," says the government, it is impossible for Appellants to "satisfy[] the causation and redressability elements of standing."

As previously noted, to plead the existence of the alleged Nondisclosure Policy, Appellants provide a slew of allegations centered on removal proceedings and asylum matters. As to the removal context, Appellants allege that FOIA "remain[s] the appropriate mechanism for obtaining documents in a noncitizen's A-file" in all circuits except the Ninth Circuit. As to the asylum context, Appellants point to DHS regulations which provide that asylum applicants, while not entitled to conduct discovery of the materials used by asylum officers, may nonetheless seek documents through FOIA requests.

Appellants' sweeping challenge is based on examples of FOIA referrals which occurred within different component agencies of DHS, i.e., removal proceedings undertaken by ICE, and asylum adjudications conducted by USCIS. But specific, disjointed instances of such referrals, without more, do not amount to an "agency action" in the form of an agency-wide policy. See Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004). Further, because the "action" Appellants allege is a collection of decentralized immigration interactions that vary in their details among the varying Agencies, it is not even entirely clear whether the harm that is asserted (i.e., the withholding or delay in making information available) will even occur in any specific instance. For example, the complaint itself alleges, and the summary judgment record confirmed, that the information a noncitizen obtains in

affirmative asylum proceedings depends on a wide range of factors, including the discretion of the asylum officer. The purported Nondisclosure Policy is simply Appellants' conclusory label that describes practices whereby various Agencies make varying degrees of information available by varying means in various proceedings.[2] As we see it, because Appellants have failed to establish the existence of the so-called Nondisclosure Policy occurring throughout the entirety of DHS in a uniform manner, we cannot conclude that their alleged injury is "concrete." Spokeo, 578 at 340 ("A 'concrete' injury must be 'de facto'; that is, it must actually exist."). Instead, it is impermissibly "speculative" or "attenuated." Clapper v. Amnesty Int'l USA, 568 U.S. 412 (2013).

Moreover, even if we assume, for the sake of argument, that a Nondisclosure Policy does exist, we find Appellants' arguments in support of organizational standing unpersuasive.[3]

---

[2] On these points, we need say little more than has already been said by the district court. See Greater Boston Legal Svcs. v. U.S. Dep't of Homeland Sec., 2025 WL 1725826, at *4-5, 8 (D. Mass. June 20, 2025); see also Greater Boston Legal Svcs. v. U.S. Dep't of Homeland Sec., 2022 WL 138629, at *6-7 (D. Mass. Jan. 14, 2022).

[3] Appellants contend that we need not conduct separate standing analyses for the individual attorneys and the legal organizations, as the "injuries suffered by the organizational Plaintiffs, a private law firm and a nonprofit providing legal services, are indistinguishable from those suffered by the individual Plaintiff attorneys." Although the government does not explicitly adopt this position, its standing arguments do not distinguish between the attorneys and organizations. Since "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals," and

Appellants liken their bid for standing to the plaintiff organization in Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). There, says Appellants, the Supreme Court found that the plaintiff organization suffered an injury in fact because defendants' actions affected their "core business activities." All. for Hippocratic Med., 602 at 395 (referencing id. at 379). Here, Appellants posit that the Nondisclosure Policy likewise affects their "mission and work [] to provide legal assistance to noncitizens" by making their representation "vastly more costly and time-consuming." Specifically, Appellants maintain that they must engage in "repeated travel to state courthouses, the hiring of out-of-state counsel to obtain needed records, numerous communications with anyone who might have relevant information or records, and even the preparation of otherwise unnecessary applications." The government contests Appellants' analogy to Havens, arguing that they better resemble the medical associations involved in Alliance for Hippocratic Medicine. Id. at 369. The government believes that Appellants, like the medical associations, are impermissibly attempting to manufacture standing "by means of voluntary expenditures."

without disagreement from the parties, we adopt this approach. All. for Hippocratic Med., 602 U.S. at 369 (citing Havens, 455 U.S. at 378-79).

Given the parties' contested readings, a brief overview of Havens and Alliance for Hippocratic Medicine is in order. In Havens, a nonprofit organization, Housing Opportunities Made Equal ("HOME"), operated a housing counseling service and investigated complaints of housing discrimination. 455 U.S. at 368. The defendant, Havens, owned two apartment complexes in Richmond, Virginia. Id. Two HOME employees -- one white and one Black -- inquired as to the availability of apartments in Havens' properties. Id. at 368. Havens told the white employee that apartments were available, whereas the Black employee was told that none were available. Id. As a result, HOME, alongside various individual plaintiffs, brought suit alleging racial steering practices in violation of § 804 of the Fair Housing Act of 1968. Id. at 366. To establish standing, HOME argued that Havens' steering practices "frustrated the organization's counseling and referral services, with a consequent drain on resources." Id. at 369. The Supreme Court agreed, holding:

> If, as broadly alleged, [Haven's] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities -- with the consequent drain on the organization's resources -- constitutes far more than simply a setback to the organization's abstract social interests.

Id. at 379.

Thereafter, in Alliance for Hippocratic Medicine, the Supreme Court considered the standing of medical associations challenging FDA regulations related to the drug mifepristone. 602 U.S. at 372-74. The medical associations' claimed injury was that the FDA regulations caused them to "spend considerable resources to the detriment of other spending priorities" -- particularly, resources diverted towards conducting studies on mifepristone and engaging in public advocacy. Id. at 394. In support, the medical associations argued that Havens stands for the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions." Id. at 395. The Supreme Court explicitly disavowed such a reading of Havens, concluding that the case did not support "such an expansive theory of standing." Id. Rather, Haven's actions -- providing HOME's Black employee with false information about apartment availability -- "directly affected and interfered with HOME's core business activities," that is, its "ability to provide counseling and referral services for low- and moderate-income homeseekers." Id. (quoting Havens, 455 U.S. at 379). Thus, Alliance for Hippocratic Medicine made clear that "an organization that has not suffered a concrete injury caused by defendant's action cannot spend its way into standing simply by expending money to gather information and advocate

against the defendant's action. An organization cannot manufacture its own standing in that way." Id. at 394.

We do not think Appellants' alleged injury is analogous to the harm present in Havens. While it is true that HOME had to expend more time and money to offset the impediment of Haven's falsehood, the simple expenditure of resources did not establish HOME's injury in fact for standing purposes. Rather, the false information caused a direct injury to HOME's ability to counsel prospective tenants. Id. at 395 ("[W]hen Havens gave HOME's employees false information about apartment availability . . . Havens's actions directly affected and interfered with HOME's core business activities -- not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."). The additional expenses incurred were a result of the injury, not the injury itself. See Havens, 455 U.S. at 379 ("[Havens'] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services . . . -- with [a] consequent drain on the organization's resources . . . ." (emphasis added)).

Here, however, the alleged injury is the additional monetary and temporal costs that result from the Nondisclosure Policy. While the falsehood in Havens made HOME incapable of providing housing counseling -- as it would be impossible for HOME's employees to advise prospective tenants that apartments are

available when, to their knowledge, they are not -- Appellants are not similarly impeded. Appellants' allegations make clear that there are alternative avenues to secure the information needed for their clients' legal representation. Although the procedure may be more tenuous than preferred, it is nonetheless a feature of the battle that Appellants have volunteered to fight. Thus, Appellants' voluntary expenditures to "gather information and advocate against the [government's] action" cannot serve as the basis for an injury in fact. All. for Hippocratic Med., 602 U.S. at 394.

Moreover, the Supreme Court characterized "Havens []as an unusual case," and cautioned "not to extend the Havens holding beyond its context." Id. at 396. We believe that Appellants' rationale for standing would do just that. It would expand the meaning of "interfere[nce] with [] core business activities" to encompass the routine costs that all lawyers bear when they represent clients. Id. at 395. It is not sufficient to allege that a challenged policy makes legal representation more costly. All procedural rules, to the extent that they require a lawyer's help to navigate, "cost money" and marginally "increase the time the Plaintiff attorneys spend on each case." It is similarly insufficient to allege that a challenged policy constrains a firm's ability to represent as many clients as it would like. For a lawyer with finite time and resources, all client engagements

"prevent[] [the lawyer] from taking on additional clients." "Lawyers who devote their time to one case are unavailable for others, and in deciding whether it is prudent to pursue a given case a firm must decide whether the cost -- including opportunities foregone in some other case . . . -- is worthwhile." Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Cartage Co., 76 F.3d 114, 116 (7th Cir. 1996).

Havens' core-business-activities exception cannot mean that any lawyer, law firm, or "organization that provides free legal assistance" may assert organizational standing, in lieu of representing an individual plaintiff, by alleging that a challenged policy increases the cost of representation or limits the size of a client roster. If such an "income" injury were enough for Article III standing, a "medical malpractice attorney could assert an abstract, generalized challenge to tort reform statutes by asserting the rights of some hypothetical malpractice victim (or victims) who might sue," or an "attorney specializing in Social Security cases could challenge implementation of a new regulation by asserting the rights of some hypothetical claimant (or claimants)." Kowalski v. Tesmer, 543 U.S. 125, 134 n.5 (2004). A law firm could sue to vacate a newly enacted state law by alleging that it increases the probability that favorable rulings in some of the firm's existing fixed-fee engagements will be appealed. Or a Second Amendment legal advocacy group could challenge a firearm

ban in one state by alleging that the cost of helping its clients comply with the ban in that state forces the group to divert resources from providing similar help to clients in another state. Or, finally, an attorney could "raise a rulemaking challenge whenever an agency promulgates a regulation that could negatively impact a client's ability to obtain benefits." Mil.-Veterans Advoc. v. Sec'y of Veterans Affs., 7 F.4th 1110, 1126 (Fed. Cir. 2021).

This is not to say that a provider of legal services never has standing to challenge a government policy on its own behalf. See, e.g., Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 161 (1st Cir. 2021) (involving a law firm's challenge of a Social Security Administration policy which hindered its ability to collect payment for its services due to the "intricacies of the SSA's procedures" for the disbursement of attorney's fees). Nor does this mean that lawyers are barred from suing to vindicate the rights of third parties. See, e.g., U.S. Dep't of Lab. v. Triplett, 494 U.S. 715, 720 (1990) (concluding that an attorney had third-party standing to challenge a provision of the Black Lung Benefits Act of 1972 which prohibited the collection of attorney's fees and failed to provide alternative means of attorney compensation, thus "render[ing] claimants unable to obtain legal representation for their black lung claims"). Importantly, however, enforcement of the challenged provisions in both of these

cases "directly affected and interfered with [the attorneys'] core business activities." All. for Hippocratic Med., 602 U.S. at 395 (emphasis added). The same cannot be said of the Nondisclosure Policy.

In sum, if we accepted Appellants' theory of standing in this case, it could functionally eliminate the Article III standing requirements for any lawyer who seeks to invalidate a government policy. If a lawyer wished to package his disagreement with the policy in a case or controversy, all he would have to do is represent a client whom the policy regulates. Then the lawyer could walk into court, leave the client at the door, and claim for his own sake that the policy makes it harder to represent the client. We do not think that this is what the Supreme Court had in mind as falling within Havens' context. Cf. All. for Hippocratic Med., 602 U.S. at 396 (warning against extending Havens "beyond its context"). Because we hold that Appellants do not have standing to assert their claims, we need not reach the merits of the same.

## III. CONCLUSION

For the foregoing reasons, we **affirm** the judgment of the district court.